George McGehee, Appellee, v. Geo. S. Mepham and Company, Appellant.

Opinion filed January 4, 1935. Rehearing denied February 25, 1935.

POPE & DRIEMEYER, of East St. Louis, for appellant.

BEASLEY & ZULLEY, of East St. Louis, for appellee.

MR. JUSTICE STONE delivered the opinion of the court.

This appeal is prosecuted to reverse a judgment of $8,000 which appellee recovered in the city court of East St. Louis, as damages for alleged disability due to an occupational disease contracted by appellee while in appellant's employ. It is claimed that said disease was caused by the wilful failure of appellant to comply with statutory provisions for the safety of its employees. The case has twice been tried, each trial resulting in a verdict for appellee. The first verdict was set aside by the trial court because it felt that the verdict ($10,000) was excessive, and appellee refused to remit. In the second trial, which is on review here, the jury returned a verdict for appellee for $12,000. On motion for a new trial appellee remitted $4,000.

As amended, the complaint charged that defendant from 1928 to 1932 operated a factory in which various

paints and paint materials were manufactured, in the process of which various rock ores and other similar materials were crushed, milled and ground, thereby causing the fine particles of rock dust, ore dust, sand dust and silica dust to fill the air therein; that because of the presence of said dusts it was dangerous for employees to breathe the air so impregnated with said dusts and which would produce an illness or disease commonly known as dusty lung, pneumoconiosis, fibrosed lung and pulmonary tuberculosis, peculiar to said employment and to which employees in other lines of employment were not exposed; that on July 3, 1928, plaintiff was employed by defendant in its factory and was almost daily and directly exposed to the danger of contracting said illness and diseases through wrongful acts of the defendant as follows, to wit: wilful failure of the defendant to adopt and provide reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases, or to furnish sufficient masks or respirators which were then such reasonable and approved devices, means or methods, in violation of par. 185, chapter 48, of Cahill's Illinois Statutes; wilful failure of the defendant to remove from said factory or workshop, so far as practicable, all of said injurious dusts by means of ventilating or exhaust devices, in violation of par. 154, chapter 48, Cahill's Illinois Statutes; wilful failure to adopt means or methods whereby said dusts would be dampened or saturated, with liquids, which means or methods were then and there approved and reasonable, in violation of par. 185, chapter 48, Cahill's Illinois Statutes.

Plaintiff charged that because of said wilful failures on the part of defendant to comply with statutory requirements, and as a direct and proximate result thereof, he contracted said dusty lung disease, pneumoconiosis and pulmonary tuberculosis by frequently inhaling said dusts; that as a result thereof he was

compelled to give up his employment on March 28, 1932, and since last mentioned date had not earned any wages and would not be able to earn any wages in the future because of disabilities due to said occupational disease, and had incurred medical expenses, and as a result of said diseases was then suffering, and would in the future suffer, pain and agony, sickness and disorder. Plaintiff demanded judgment in the sum of $52,000.

Defendant answered the amended complaint, admitting the operation of its factory, in which paint pigments were manufactured, but denying that in said process of manufacture fine particles of rock dust, ore dust, sand dust or silica dust filled the air; it denied that it was dangerous for defendant to work in said factory or that employees therein were subjected or exposed to the danger of contracting illness or disease known as dusty lung, pneumoconiosis, fibrosed lung and pulmonary tuberculosis, or either of them, or that said diseases, or either of them, were peculiar to said employment. It admitted plaintiff's employment, but denied that he was at any time exposed to the danger of contracting any illness or disease, or that he did contract the diseases described by plaintiff as dusty lung, pneumoconiosis, fibrosed lung and pulmonary tuberculosis, or either of them, or that he was compelled to give up his employment at any time because of disability resulting therefrom, or that he was then, ever had been, or ever would be, disabled to any extent because of any alleged occupational disease contracted by him while in the employ of defendant. Defendant denied that any injurious dusts were created or occurred in the course of its manufacturing processes and that it wilfully failed to remove from its factory any injurious dusts by means of ventilating or exhaust devices; it denied that it was engaged in carrying on any work or process which might produce

or subject employees to the danger of contracting the alleged diseases in plaintiff's complaint mentioned; it denied that it wilfully failed and refused to adopt reasonable and approved devices, means or methods for the prevention of said alleged occupational or industrial disease; it admitted that in the department of its plant in which tripoli was processed it furnished respirators to its employees engaged in the manufacturing processes carried on therein; that it did so not because of any knowledge or belief upon its part that employees working therein might or could contract said alleged diseases, but as a precautionary measure; it denied that there was any necessity for the use of respirators or masks in that or any other department of its plant, or that employees working in any department of its plant were subjected to the likelihood of contracting the alleged occupational diseases complained of which might have been prevented by the use of respirators or masks, or by adopting means or methods for dampening or saturating any dust occurring in its plant with liquids, and denied that there were any practicable methods or means by which any dust occurring in its manufacturing processes could have been dampened or saturated with liquids. Defendant, by amendment to its answer, said further that the machinery, apparatus and equipment in that part of its plant known as the White Mill and used for the processing of tripoli or silica was installed in or about the year 1925; that such instalment was made only after the result of thorough investigation, study and experiment extending over a period of five years prior thereto as to the manner in which tripoli might be processed and the nature and character of machinery, appliances and equipment which might be employed in so doing, so as to prevent the escape of dust into the building in which such process was carried on; that the machinery, appliances and

equipment constructed and installed after such investigation, study and experiment, remained in use during the period in which plaintiff was employed in defendant's factory, and that the devices, means and methods employed and used in the method of processing silica and tripoli during all of such time were reasonable and approved devices, means and methods for the prevention of the escape of dust in the handling or processing of tripoli or silica and for the prevention of any injury to the health of the employees working in said department of defendant's plant.

It is first urged that the court was without jurisdiction to hear this case for the reason that the matters charged in the complaint are cognizable under section 2 and not section 1 of the Occupational Diseases Act, Cahill's St. ch. 48, ¶ 186. In other words that appellee's remedy, if he had one, was compensation through the State industrial commission and not damages at common law to be recovered through the courts.

We have examined the sections above referred to together with the cases cited by the respective parties on this question, and are of the opinion that this contention cannot be upheld. It seems quite plain that the legislature in enacting the Occupational Diseases Act with its amendments, undertook to make a distinction between those diseases especially dangerous and those not especially dangerous. Those not especially dangerous were classified in section 1 of the act. That section has not been changed. Those diseases especially dangerous were classified in section 2. Silica industries have been held to belong in the classification of section 1. *First Nat. Bank v. Wedron Silica Co.,* 351 Ill. 560. It is claimed by appellant that our Supreme Court in the case of *Burns v. Industrial Commission,* 356 Ill. 602, by its construction of section 2 of the act, brought within that section such diseases as silicon diseases. Appellant bases this claim upon the words of the third of the three classes of employments

enumerated in that case as belonging in said section 2. That class is there described as: "Any process of manufacture in which poisonous chemicals, minerals or other substances are used or handled in harmful quantities or under harmful conditions."

The language is not subject to appellant's interpretation. The word "poisonous" does not modify the word "chemicals" and stop there, but it modifies the words "minerals" and the word "substances" as well. It is very plain, therefore, that the words "other substances" were not intended to embrace all substances—those classified in section 1 together with the rest. It is limited in its meaning to poisonous substances such as are especially dangerous. If it were not so there would be no excuse for keeping section 1 in the statute. Our Supreme Court has retained the distinction. The word "noxious" used further on in the section does not, in our judgment, interfere with this interpretation.

From July, 1928, to March, 1932, appellee worked in appellant's paint factory. During those years he worked in most all of its departments. Appellant's Exhibit 6 shows the hours in which appellee worked in the respective departments. According to that exhibit, he worked in the Red Mill, the Silica Production Department, at miscellaneous cleanup work, in the Cooper Shop, the White Mill, the Black Mill, the Granite City Plant, the boiler house, the maintenance department and the warehouse. That the conditions under which appellant's employees worked in these departments were of the character described in section 1 of the Occupational Diseases Act appears obvious. A large number of witnesses testified concerning those conditions. One repaired the conveyor in the Silica Mill. The silican dust coming from these cracks and holes was as fine and dry as flour. There was "a regular fog of silican dust around the elevators." This extended 20 feet from the packer or

elevators. The dust in the Red Mill was like what you would see driving down a dusty road. At the end of a day's work the men's clothing would be covered with red dust. There were no devices for carrying out dust either in the Red Mill or the Silica Mill.

Another who was the operator of the Silica Mill testified that the dust around where he worked was so dense that if he set a barrel out clean he could write his name on it in just a little while in silica dust. This dust was a fog. It hurt this witness. He felt the weight of this dust he breathed in his lungs. After he worked there for a week, he had to lay off. The floor around the Silica Mill would be white with silica dust, and the windows would be covered with it. Another witness described the Red Mill as looking like a fog of dust where an automobile passed. This witness after describing the dust conditions of the Red Mill at length said: "I did not see any machinery or devices for removing dust except me and my spade and my broom." He also says there was silica dust around the packer which made a fog to the ceiling, made the walls look as if they had been whitewashed and become shoe mouth deep on the floor.

Another witness described the dust of the Red Mill as a fog so bad you couldn't see a man 20 feet away.

These are a few excerpts from the testimony of the many witnesses who were employees of appellant during the time appellee was who are unanimous in describing the dust conditions of appellant's mills and the effect those conditions had upon them. It seems almost incredible that men should be expected to work under such conditions. Appellant knew and understood these conditions as his foremen were through the mills from time to time and saw them.

To this setting, appellee came, free from any of the ailments which he suffered after leaving the employ of appellant. From appellant's employ, appellee went

to doctors for months. These doctors treated him and described his condition to the jury.

The testimony of appellant's witnesses does not satisfactorily meet the evidence above detailed. It is largely of a negative character. Many of the witnesses "did not see" the things described by the witnesses for appellee. That modern and effective means of getting rid of the dust of these mills was not employed is met by the declaration that such means were either not necessary or not practicable for these particular mills. An attempt is made by one of appellant's managers to describe the adequacy of the means employed by appellant against dangers of the various dusts. This description admits the necessity of the means described in the statute and also serves to make clear the inadequacy of the means employed. This is also true of the use of the respirators which appellant contends were unnecessary but employed as a precaution. The testimony of the 15 or more witnesses, called by appellee to describe conditions in these mills, cannot be disproven, by the theories of experts. Fact is one thing; theory is another.

If this lawsuit were to be determined on whether the evidence shows that the mills in question were operated in violation of the statute under which this suit is brought there would be no need of further discussion. There is a clear preponderance of the evidence that they were so operated.

Does this record fairly show that appellee was damaged as alleged in his declaration? Two juries have so found. Twice has the trial court approved of the juries' findings of fact.

We must dismiss, without further ado, appellant's contention that the trial court erred in not peremptorily instructing the jury. That contention belongs in the realm of extravagant statement. *Pollard v. Broadway Hotel Corp.,* 353 Ill. 312; *Commercial Ins.*

*Co. v. Scammon,* 123 Ill. 601; *Mirich v. Forschner Contracting Co.,* 312 Ill. 343.

We come, therefore, to the controlling question in this case, viz.: Are the verdict and the judgment thereon against the manifest weight of the evidence?

Dr. Campbell, a physician of large experience in the diseases of the lungs and particularly of diseases produced by inhaling dusts, first saw appellee in August, 1933. Appellee had a persistent dry cough, and his respiration was more rapid than normal; his face was cyanotic and his body pale; he had increased dullness over both lungs; fine rales could be heard with a stethoscope over this area. There were increased breathing noises. He had limited chest expansion with rapid respiration. The rales indicated an inflammatory condition going on in the small air sacs of the lungs. Dr. Campbell described in great detail the changing conditions of appellee during the long time he had him under observation particularly as to abnormality of temperature and fever. He says he was under the impression that he had some permanent condition of the lungs. ''I believe that he had what we call pulmonary fibrosis with some acute infection going on together with it.'' Silica dust would produce irritation and fibrosis of the lungs. Plaintiff's Exhibits C and B show involvement of the lungs. Appellee is suffering from tuberculosis. He has a permanent pathological condition in his lungs. The period of time appellee worked in appellant's factory under the conditions would be sufficient to develop fibrosis of the lungs. If he developed fibrosis where his lungs were in constant state of irritation and pathological change, then the breathing of tubercular germs make it much more easy for him to develop the disease. This would be attributable to appellee's employment.

Dr. Tripple, a physician of wide experience, both examined appellee and took X-ray pictures of him. He

found rales, fibrous tissue and extensive fibrosis of the lungs. He also found nodulations. We cannot in reasonable space set out the testimony of the doctors who testified in this case. The record is long and involved. We can only consider the value of the witness' conclusions from the standpoint of the foundation laid for his conclusion and thereby determine the value of his conclusion and its probable aid to the jury. Dr. Tripple testifies that it is his opinion that appellee is suffering from silicosis. His condition is permanent. The silicosis is complicated by some superimposed infection. "My opinion is that it is tubercular."

Dr. Grodwohl examined the X-ray pictures, and says that appellee's condition is a suggestion of tuberculosis of the lungs, but not conclusive. Scar tissues or fibroids such as are shown by the X-ray films are a permanent deposit in the lungs.

Appellant called six eminent specialists all of whom testified from X-ray plates, but not from personal examinations of appellee. Their testimony is in most respects quite opposed to the testimony of the doctors called by appellee. They testify that the X-ray plates do not show the things which the other doctors claim to have found there.

The testimony of Dr. Hayhurst includes substantially the testimony of all the doctors called by appellant. He testified that silicate dusts may damage the lungs. Silicosis is a condition or disease of the lungs; the result of breathing over a long period of time fine dust composed of silica.

Whether silicosis creates a situation which affords a better field of cultivation for tuberculosis germs is a controversial point.

A man could not contract silicosis by breathing an accumulation of dusts in which silica did not form more than seven per centum of the mixture. There is no evidence of silicosis in the X-ray picture. Ex-

hibit E shows no sign of nodulations. Exhibit C shows an old tubercular condition but not active.

The testimony of all the doctors when summed up is to the effect that by appellee's doctors it is shown that appellee is suffering from lung trouble contracted from the work of his occupation and that such disease is permanent. The effect of the testimony of the doctors called by appellant is that the conditions found by the former are not true and could not possibly be true, either from X-ray examinations or otherwise.

The jury saw the witnesses and heard them testify. Obviously they placed their belief in the testimony of the doctors called by appellee. Another jury did the same. We are asked to hold that notwithstanding those verdicts, the truth is given by the doctors called by appellant. Medicine, like law, is not an exact science. If it were it would be possible to find a certain decision for such questions as are contained in this record. Indeed there are several matters in this record which all the doctors agree are not capable of definite decision.

The weight of medical authority were we able to determine that weight in favor of appellant, does not decide the question here involved. We are asked to hold that the judgment in this case is against the manifest weight of the evidence. We do not feel warranted in so holding.

Complaint is made that the judgment is excessive. The trial court considered that question and caused the verdict to be reduced to what in its judgment was compatible with the evidence.

The judgment of the trial court is affirmed.

*Judgment affirmed.*