Robert Fetterman, Plaintiff-Appellee, v. Production Steel Company of Illinois, and A. T. Herlin & Son, Inc., Defendant-Appellant.

Gen. No. 46,430.

First District, First Division.

December 13, 1954.

Released for publication March 7, 1955.

404

Ross, Berchem, Schwantes & Thuma, of Chicago, for appellant.

Peter Fitzpatrick, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Robert Fetterman brought an action against Production Steel Company of Illinois and A. T. Herlin & Son, Inc., to recover damages for injuries sustained as the result of falling from a scaffold which had been erected by the latter at the site of a building construction project in Broadview, charging that the defendants in the erection and maintenance of the scaffold were guilty of negligence and of violating section 1 of the Scaffolding Act (par. 60, ch. 48, Ill. Rev. Stats. 1953 [Jones Ill. Stats. Ann. 45.101]). The steel company was the owner of the building being constructed and A. T. Herlin & Son (hereinafter called defendant) was a subcontractor engaged in doing the bricklaying on the project. Defendant erected and used the scaffold. Plaintiff was an ironworker employed by Abell-Howe & Company, the general contractor, which also did the structural ironwork. The defendant was found guilty with damages assessed at $50,000 and the steel company was found not guilty. The defendant appeals. Plaintiff has not filed a cross-appeal as to the steel company and it is no longer in the litigation. The court allowed a motion for a directed verdict as to the charge of common-law negligence and the sole issue submitted to the jury was the charge of violation of the Scaffolding Act.

Defendant maintains that the court erred in refusing to enter judgment in its favor because the Scaffolding Act is not applicable to the facts. It says that plaintiff, by his conduct in climbing the outside interlacing of the scaffold rather than using the ladder which had been provided and was available, used the scaffold in such an irregular, unwarranted and uncustomary manner as to make the Scaffolding Act inapplicable and that it was not contemplated that the Act be made applicable regardless of the use or abuse to which the

scaffold should be put. Plaintiff insists that whether his injury was the proximate result of defendant's willful violation of the Act was a question of fact under the evidence and that he was injured when the guard-rail protecting the working surface of the scaffold came apart. In deciding this point we view the evidence and the inferences drawn therefrom in the aspect most favorable to plaintiff.

On March 3, 1952, the steel company was in the course of enlarging its plant by having built for it an addition which extended 300 feet north and south and 80 feet east and west. The defendant (the brick contractor) was maintaining a scaffold extending 80 feet along the entire west wall of the addition, then around the northwest corner as a continuing scaffold for 30 to 40 feet along and against the north wall. The floor of the scaffold throughout its length was 20 feet above the ground. Plaintiff was a structural ironworker. He had been employed by Abell-Howe & Company when the steel framework was originally constructed in January 1952. Then the defendant commenced to do the brick work. The bricklayers, starting at the ground level, used a scaffold as their work progressed. It is described as a pipe type scaffold which defendant leased in 1949 and had been in use by it on various jobs to the day of the trial. That type of scaffold consists of various brackets, bars and crossbeams designed to fit into corresponding parts so that the scaffold could be built on and added to in order to reach any desired height or length. At the top level of the scaffold where the wooden platform was laid was an outside extension bracket. The bracket consisted of two triangles, one approximately 20 x 20 inches and a smaller compensating triangle bolted to the larger triangle. A sleeve or socket was welded to the side of the smaller triangle. A two-inch pipe fitted into this sleeve or socket and formed the upright bar of an angle iron

handrail which extended around the exterior of the scaffold. There were two studs affixed to the upright bar, one at the top and one at a point approximately in the center. Seven-foot angle irons which formed the handrailing were placed over the studs on the upright bar so as to form the handrail. The angle irons were fastened onto the studs by means of wing nuts.

The extension bracket was designed to bear the same weight as the other parts of the working platform and to support the weight of a 200-pound man standing on the edge of the bracket next to the upright post. The post also would support the same weight. Plaintiff weighed between 180 and 185 pounds. Plaintiff, his foreman and other ironworkers, had commenced to work at another project that morning. During the morning they came over to the steel company's project for the purpose of installing a steel beam, also referred to as a sash strut, in the north wall near the northwest corner. This installation became necessary because of a change in the plans decided upon between the steel company and the general contractor. Defendant was not consulted in reference to the change in plans. Plaintiff and his coemployees brought with them the steel beam, a movable crane with which it was to be hoisted to its place and other necessary equipment. Defendant's bricklayers stopped working at the part of the wall where the strut was being placed. While plaintiff and his foreman were erecting the sash strut one of defendant's brickmasons came to the place where they were working and measured to see if the cement coping used to top the brick wall would fit. We conclude that the employees of the defendant knew of the change being made in the construction of the building.

Plaintiff testified that under the direction of his foreman he went onto the scaffold three or four times prior to the occurrence. On the first occasion he walked from where he had been standing for a distance of 60

to 65 feet to a ladder extending up to the floor level of the scaffold. The ladder was inside the building and extended through an opening in the scaffold. It was at a point on the scaffold along the west wall of the building addition and near the southwest end of the construction work. He climbed the ladder to the scaffold floor, walked along the scaffold for the distance which it extended along the west side of the addition, walked around the northwest corner of the scaffold and then eastward for a distance of about 20 feet to the point where the steel installation was to be made. The crane run was about 3 feet above the level of the scaffold floor and one could easily step from that floor onto the crane run. He then returned to the ground floor level by retracing his steps along the scaffold to the place where he had previously been, beneath the point where the installation was to be made. On two or three additional occasions, making a total of either three or four times that morning, he walked the 60 to 65 feet to the ladder, ascended it, walked around the scaffold to where the steel beam was to be installed and retraced his steps to the ground level. On each of these occasions he used the ladder going up and coming down.

The steel beam was hoisted to a strut at the west end. When it was affixed to the strut at the east end it was discovered that the holes did not match. Plaintiff was sent down to get the torch so as to cut the holes a little larger. He returned to the ground, again using the ladder at the southwest corner. He wheeled two tanks of acetylene and oxygen over to a point north of the scaffold and at a point underneath where the sash strut was to be erected, which was about 20 feet east of the west edge of the scaffold. He laid out the two hoses which are attached to the tanks and affixed the torch to the opposite end of these hoses. He then draped the hose over his right shoulder with the torch

hanging in front and the hose behind him. There existed in the building industry a custom that workmen of one trade use the scaffold of another trade when it was in place and convenient. It was a well-recognized and common custom and practice for ironworkers to climb the outside of scaffolding and this custom was well known to brickworkers. Plaintiff climbed the post of one of the standards of the scaffolding using the braces and webbings of the standard itself and the braces that connected the standard to the standards on either side of it. He used his hands on the scaffold as he climbed.

He had completed his climb and was in a kneeling position facing east with his left knee on top of the extension bracket and his hands on the upright post to which the guardrails were attached. He had gained access to the board. His weight was resting on his left knee. He was ready to put his right foot onto the floor of the scaffold. While he was in that position the handrailing behind and in front of him came apart and the lateral supports of the upright post that he was holding and the bracket were "nullified," and the upright post twisted, bent to the west and he plunged to the ground, injuring his left leg. After the occurrence the small triangle which was welded to the socket which held the upright post was found to have come apart and was twisted and there were no wing nuts on the studs of the two upright posts on either side of the place from which plaintiff had fallen.

■■ The Scaffolding Act (pars. 60 and 69, ch. 48, Ill. Rev. Stats. 1953 [Jones Ill. Stats. Ann. 45.101, 45.110]) imposes a statutory liability in cases of willful failure to comply with the Act upon the owner, contractor and subcontractors. The object of the Act is to prevent injuries to persons employed in dangerous and extra-hazardous occupations so that negligence on their part in the manner of doing their work might not

prove fatal. For these reasons contributory negligence and assumed risk are not a defense. See John Griffiths & Son Co. v. National Fireproofing Co., 310 Ill. 331; Schultz v. Henry Ericsson Co., 182 Ill. App. 487, aff'd 264 Ill. 156. We agree with the plaintiff that it is a reasonable inference that the cause of the platform guard coming apart was the failure to have wing nuts on the studs of two of its upright posts. The wing nuts were intended to hold in place the horizontal irons which gave lateral bracing and stability to the upright posts of the guardrail. With the wing nuts in place none of the upright posts could have bent in any direction. Without the wing nuts a concealed hazard existed and the railings might fall and an upright post might bend.

Defendant states that the simple and sensible procedure for raising the cutting torch and acetylene hose would have been to drop a line and pull it up. It disclaims any desire to tell plaintiff and his employer how to run their business and suggests that if plaintiff and his employer are about to embark on some extra-hazardous and dangerous adventure they should not be heard to complain that the equipment which they appropriated was not adequate for their purpose, especially when it was never contemplated that the equipment should be so used. Both parties recognize that the hose attached to the acetylene tank was not long enough to reach the ladder by which the plaintiff had climbed to the scaffold previously that morning. Plaintiff, standing on the ground at the foot of the scaffold with the hose, saw what appeared to be a solid substantial scaffold securely tied to the building every 20 feet. The hazard connected with the scaffold was the concealed defect arising from the absence of the wing nuts. We find that in the light most favorable to the plaintiff the evidence presented a reasonable inference that he had completed his climb and had

411

reached the working level of the scaffold and was in substantially the same position that he might have been in had he been bringing the cutting torch by some other method. It therefore presented a question of fact for the jury whether the proximate cause of his injury was his climbing the scaffold or defendant's willful violation of the Scaffolding Act.

 Whether winged nuts were necessary to hold the angle iron guardrailings on studs 1¼ inches long was a question of fact for the jury. There was testimony that it is common usage among contractors and employees in the building industry for the members of one trade to use the scaffold of another when it is in place where they have work to do. It is common knowledge that it requires more than one trade to erect a modern building. In the instant case the steel men had to install a sash strut before the brickmasons could complete their work. Plaintiff was properly working on the building as an employee of the general contractor. He was rightfully on defendant's scaffold by reason of a custom and usage that benefited all contractors. The work in which plaintiff was engaged was not only of interest to him and his employer but it had to do with the erection of the building in which the defendant was likewise interested and was necessary to the resumption of the brickmason work at that point. We conclude that he was an invitee on the defendant's scaffold because of the usage by contractors and employees in the building industry. There was competent evidence to support the verdict based on the proposition that plaintiff's injury was the proximate result of defendant's willful violation of the Scaffolding Act.

██ Defendant maintains that the court erred in refusing to sustain its objection to evidence in reference to custom and usage, pointing out that in an attempt to justify plaintiff's actions in climbing the exterior interlacing of the scaffold, evidence was

412

offered to establish custom and usage. The evidence introduced by plaintiff that it is common usage among contractors and their employees engaged in the building industry for the members of one trade to use the scaffold of another where it is in place where they have work to do, is not challenged. We are of the opinion that it was proper for the plaintiff to introduce evidence that climbing the scaffold was a normal and proper method of ascent. In a tort case custom and usage is a fact to be proved as any other fact and it may be the subject of expert testimony. Dickson v. George B. Swift Co., 238 Ill. 62, 65; O'Rourke v. Sproul, 241 Ill. 576, 582; Fowler v. Chicago Rys. Co., 285 Ill. 196, 200; Gourley v. Chicago & E. I. Ry. Co., 295 Ill. App. 160, 176.

 Defendant asserts that the court committed reversible error in giving plaintiff's instructions nos. 5 and 6. These instructions inform the jury about the relevant provisions of the Scaffolding Act and that the burden was on the plaintiff to prove that defendant was guilty of willful violation of that Act. Defendant's given instruction no. 1 told the jury that plaintiff could not recover unless defendant's willful violation was the proximate cause of plaintiff's injury, and its given instruction no. 4 told the jury that if plaintiff's conduct in climbing the scaffold was the sole proximate cause of his injury, he could not recover. Defendant argues that the phrase in the last paragraph of instruction no. 5 that "it is enough if a dangerous condition is known to exist or if by the exercise of reasonable care such condition would have been discovered" could be interpreted to mean that the jury might find the defendant guilty, and that it would then be a peremptory instruction and would call for a reversal of the judgment because it does not contain all of the necessary elements to support a verdict for the plaintiff. We believe that the language is somewhat unguarded and should have

413

been left out of the instruction but do not think that it is a peremptory instruction. The jurors were told that the instructions were to be considered as a connected series and would understand that plaintiff could not recover unless they found that defendant willfully violated the statute and that such willfulness was the proximate and direct cause of plaintiff's injuries. We are satisfied that the jury was not misled by the instruction.

■■■ The sixth instruction given at the request of plaintiff told the jury that in a suit under the Scaffolding Act contributory negligence of the plaintiff will not prevent him from recovering if he is otherwise entitled to recover. Defendant's objection to this instruction is that it should also inform the jury that they must find that the Act is applicable to the facts of the case. The issue as to whether the injury was caused by plaintiff's manner of climbing the scaffold or by defendant's willful violation of the Act was presented in five instructions given at the request of the defendant. The court did not err in giving this instruction.

■■■ Defendant urges that the court erred in refusing to give an instruction that it is not every accident which makes a defendant liable for damages for personal injury, and that if the accident was unavoidable and without willfulness as to the defendant, no liability is incurred, and that if the jury believe from the evidence and under the instructions that the injury was unavoidable and without willfulness on the part of the defendant they should find it not guilty. The part of the instruction which tells the jury that it is not every accident which makes a defendant liable would tend to mislead the jury. Defendant also states that the court erred in refusing to give an instruction that in order to recover for an injury occasioned by a violation of the statute relating to scaffolds the plaintiff must prove by a preponderance of the evidence that

the defendant's failure to comply with the statute was a willful violation, and that proof of a negligent violation would not be sufficient. Other instructions in behalf of the defendant told the jury that plaintiff could not recover unless the defendant was guilty of a willful violation of the statute. The subject matter of defendant's "refused instructions" nos. 5 and 6 are adequately covered by other instructions.

Because of these views the judgment of the circuit court of Cook county is affirmed.

Judgment affirmed.

FRIEND and NIEMEYER, JJ., concur.